

# LAW OFFICES OF MATTHEW C. HINES, LLC

1900 THE EXCHANGE SE, BUILDING 500
ATLANTA, GEORGIA 30339
770.941.0913 • FAX 770.941.0919 • HINESLAW.ORG

---

April 18, 2019

<u>**VIA CERTIFIED MAIL: 7019 0160 0000 2638 3239**</u>
Sharon Guzman, Adjuster
Claims Management
P.O. Box 14731
Lexington, Kentucky 40512

| | | |
|---|---|---|
| RE: | Our Client: | **Zeporah Moore** |
| | Your Insured: | **Walmart, Inc.** |
| | Location of Loss: | **Facility #3741** |
| | | **1105 Research Center Drive** |
| | | **Atlanta, Georgia 30331** |
| | Date of Loss: | **July 31, 2018** |
| | Claim No.: | **8519611** |

Dear Ms. Guzman:

This firm represents Zeporah Moore in her claim for serious bodily injuries sustained in her fall at property owned by your insured, resulting solely from the misconduct of your insured as set forth below. This letter and all attached exhibits are submitted for purposes of compromise and settlement of the Fall, inadmissible as evidence in the event of litigation, except as provided by law, as this demand is also made under O.C.G.A. § 51-12-14, Interest on Un-liquidated Damages. Enclosed are copies of the hospital/medical reports and statements.

## I. APPLICABLE FACTS.

On or about July 31, 2018, Ms. Zeporah Moore was parked in the parking lot in close proximity to the Wal-Mart Facility located at 1105 Research Center Drive, Atlanta, Georgia 30331, as she intended on buying batteries for her garage door opener. There had been a downpour earlier that day; therefore, Ms. Moore waited in her car until it was just a little misty. She exited her vehicle and began walking to the shopping center. As she entered into the first lobby, suddenly and without warning, she fell onto her left hip. As she fell, she extended her left arm in an automatic reflex to protect herself from the fall. She reported that the floor was wet and her left foot went under the rug, causing her to fall. Throughout this letter this fall is referred to as the "incident".

O.C.G.A. § 51-3-1 states as follows:

Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in

**DEFENDANT'S EXHIBIT A**

> damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

Under Georgia law, the owner of real property must exercise reasonable care to make the premises safe for an invitee. "Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." *Williams v. GK Mahavir, Inc.*, 726 S.E.2d 71, 74-75 (2012); *Perkins v. The Val D'Aosta Company*, S.E.2d 380, 383 (2010). A property owner must exercise ordinary care in inspecting and maintaining the premises and maintain adequate procedures to discover and remedy potential hazards. *Parker v. All Am. Quality Foods, Inc.*, 734 S.E.2d 510, 513 (2012). Where a reasonable inspection would have revealed the dangerous condition, the company will be charged with notice of the condition. *Perkins, id.* An invitee is charged with notice of the danger only where it is "readily discernible." *Perkins*, 699 S.E.2d 380, 383.

Here, our client was invited by your insured onto the Property for the profit of your insured, who had a legal duty of ordinary care to our client to keep the Property safe. Clearly, your insured breached its duty to our client by failing to maintain the Property in suitable conditions. My client has suffered physical and mental pain and suffering as a proximate and/or direct result of her fall at the Property, who is entitled to general and special damages against your insured such as but not limited to past, present, and future medical expenses, lost wages, lost earning capacity and present and future pain and suffering. Furthermore, she would be entitled to attorney's fees under O.C.G.A. § 13-6-11 if this case proceeds to litigation. My client's injuries are detailed below with a demand for resolution.

Ms. Moore's personal life was adversely affected due to your insured's negligence. With a fractured left wrist and left hip, Ms. Moore found herself in an altered state. Prior to the fall, Ms. Moore was an independent and respected matriarch of her family who was always busy entertaining her family. She took pride in keeping an immaculate home, cooking, maintaining her garden and landscaping. Shopping at department stores and grocery stores were a favorite pastime for her as well. She kept herself well-groomed and well-dressed at all times.

Since the fall, she has been unable to continue these activities. Due to her hip fracture, she was forced to use a walker and stay on the main level of her home during the day. In the evenings, her grandson would carry her up and down the stairs to her bedroom and bring her down in the mornings. She needed assistance bathing herself as she was unable to get her cast wet or sit/stand in the bath for an extended period of time. She had severe weakness in her left wrist as well, which made many simple tasks extremely difficult. Her left wrist surgery disfigured her left arm, leaving it permanently distorted for the remainder of her life. (*See* photographs).

She had visiting nurses come to her home to help her with physical and occupational therapy. It was embarrassing for her to need assistance as prior to the fall, she was always a self-sufficient woman. She felt vulnerable as she was unable to take care of herself due to the injuries caused by your insured's negligence, which has negatively affected her life physically, mentally and emotionally.

Ms. Guzman
April 18, 2019
Page 3

## II. INJURIES OF ZEPORAH MOORE.

### a. Grady Memorial Hospital.

Following the incident, Ms. Moore was transported to Grady Memorial Hospital. She was placed under the care of William M. Reisman, M.D. She reported that she was walking in Walmart and slipped on the wet floor. Her FOOSH (Fall on an Outstretched Hand) injury left pain in her left wrist and left hip.

Upon physical examination of Ms. Moore's upper left extremity, Dr. Reisman noted swelling around her wrist and forearm with an obvious deformity. Her left hip was tender to palpation over the greater trochanter, but no pain with aggressive log roll. She did have lateral hip pain with straight leg raise and minimal pain at rest. She was treated with oral and intravenous medications.

### X-rays performed revealed the following:

X-ray wrist: **comminuted, impacted and shortened fracture of distal radius with dorsal angulation**
X-ray hand: **distal radius fracture as above, no acute fractures or dislocations of the carpus, MC's or phalanges**
X-ray forearm: **distal radius fracture as above, radial and ulnar shaft intact, no apparent elbow**
X-ray elbow: no fractures or dislocations
X-ray pelvis: no apparent fractures or dislocations

Following x-rays, her rings were removed from her hands due to swelling. A closed reduction procedure was performed by Jeremy Flederer, M.D., orthopaedic surgeon, on her distal radius fracture. The procedure was performed as follows:

The patient's left forearm was palpated in order to locate the fracture site and this was marked. Neurovascular assessment was performed prior to hematoma block. The arm was prepped using betadine solution in preparation for a hematoma block. A 22-gauge needle was inserted into the fracture site in sterile fashion and the correct location was confirmed by withdrawing fracture hematoma. Approximately 12 cc of 1% lidocaine solution was injected into the fracture hematoma. The arm was then suspended from an IV pole in normal fashion in order to induce muscular fatigue and relaxation. IV pain medication was provided and when adequate analgesia was confirmed, the fracture was manipulated to reduce it into a more anatomic position. The reduction was held while the arm was placed in a sugar-tong plaster splint. The patient's neurovascular exam was unchanged following reduction. The patient tolerated the procedure well without complications. Post-reduction radiographs were attained demonstrating interval improvement in fracture alignment.

After recovery from surgery, she was instructed to maintain splint. She was advised to keep her upper extremity elevated on pillows while at rest to help reduce swelling and pain.

A limited X-ray of her pelvis revealed no abnormalities. Following the x-ray, a CT scan of her pelvis was performed and revealed a **displaced fracture of the left inferior pubic ramus; a nondisplaced fracture of the anterior wall of left acetabulum at pubo-acetabular junctional with probable intraarticular extension; left LC1 pelvic ring injury and mildly displaced and minimally angulated fracture of the left inferior pubic symphysis.**

On August 1, 2018, Ms. Moore had a bedside visit from Sarah Cocks, PT/OT, for an evaluation of self care that proved a 30% impairment rating. Therapist Cocks recommended Home Health Occupational Therapy upon discharge.

Ms. Moore had a bedside visit from Amy Clark, PT, on August 3, 2018, for therapeutic exercises for her left upper and lower extremities. Therapist Clark helped Ms. Moore to situate onto a walker and Ms. Moore walked at a slow cadence for approximately 15 feet. Therapist Clark noted, "Patient shows improvement in mobility and gait. Continues to require platform walker for support 2/2 LLE pain and weakness. Patient is motivated and will continue to benefit from skilled PT."

On August 6, 2018, Ms. Moore was instructed to begin physical and occupational therapy beginning on August 21, 2018. She was prescribed home health care due to the fact that she required significant support devices, the assistance of another individual for her activities of daily living and activity restrictions. She was instructed on the use of a bedside commode and a rolling walker with platform attachment.

Following physical therapy sessions, rest and medications, Ms. Moore was discharged home on August 7, 2018, with Home Health Occupational Therapy prepared to visit her home regularly to provide occupational therapy to help her achieve goals to aid her in being self-sufficient. She reported that her grandson would carry her upstairs to her bedroom as she was unable to walk without her walker at the time of discharge.

On August 16, 2018, Ms. Moore presented to Diane Payne, M.D. for a follow up evaluation of her left wrist. Upon physical examination, Dr. Payne noted pain and tenderness that was being controlled with NSAIDs. Ms. Moore reported that she had been ambulating with a platform walker. Dr. Payne discussed possible surgery in regards to Ms. Moore's wrist, but my client wanted to treat conservatively with a cast and NSAIDs for the meantime. Therefore, a cast was placed and Ms. Moore was instructed to return in six weeks for x-rays and cast removal.

Ms. Moore presented to Dr. Reisman on August 16, 2018, for a follow-up appointment for her pelvic fracture progress. She reported that her pain was a 3/10 at the time of the visit and that she was using her walker occasionally, but prefers to walk in order to gain her independence. She was instructed to follow up in four weeks.

Ms. Guzman
April 18, 2019
Page 5

Diagnoses:

1) Unspecified fracture of the lower end of left radius, initial encounter for closed fracture (S52.502A);
2) Fracture of other parts of pelvis, initial encounter for closed fracture (S32.89XA);
3) Fracture of unspecified parts of lumbosacral spine and pelvis, initial encounter for closed fracture (S32.9XXA); and
4) Hypertension (I10).

### b. Visiting Nurse Health System

On August 13, 2018, Visiting Nurse Health System assisted Ms. Moore by sending physical therapists to her home in order to aid her with physical exercises and occupational therapy. The therapists' duties were included but not limited to the following:

- Monitor blood pressure/pulse rate/respiration and temperature
- Left lower extremity--weight bearing as tolerated
- Left upper extremity—no weight bearing
- Establish/upgrade home exercise program
- Provide therapeutic exercises designed to restore functional strength and range of motion
- Educate patient in fall prevention strategies
- Provide balance training interventions
- Instruct in safe transfers with appropriate body mechanics and equipment
- Evaluate gait and provide gait training using appropriate assistive device
- Monitor for pain and provide instructions regarding pain control including pharmacologic and non-pharmacologic methods
- Review medication profile and reconcile medication every visit
- Instruct on fracture to left pelvic ring and left radius, to include definition, signs/symptoms, and measures to promote healing and prevent complications

On the initial visit of August 13, 2018, Ms. Moore was visited by Veronica Edwards, PT. Therapist Edward's notes for this visit were as follows:

> Patient is a 79-year-old female who had a fall on 7/31/18 on a wet floor in Walmart. Paramedics were called and she went to the hospital and was admitted for 7 days. She fractured her left wrist and left side of pelvis. She was discharged home on 8/7/18. She is using a platform walker for ambulation. She is wbat [weightbearing as tolerated] on lle [left lower extremity] and nwb [no weightbearing] on lue [left upper extremity]. Patient stays on first level until she can comfortable get up the stairs. Patient presents with weakness in bilateral lower extremities. Decreased dynamic balance. Decreased independence with functional mobility, and decreased muscular endurance. Patient will benefit from skilled physical therapy treatment to address and payments and functional

limitations. Patient and caregiver educated on physical therapy plan of care and verbalized understanding and agreement.

On September 7, 2018, following 8 visits with the home health care therapists, Ms. Moore was released from care, as she had accomplished all the goals that were set before her.

1) Unspecified fracture of the lower end of left radius, initial encounter for closed fracture (S52.502A) (Onset);
2) Multiple fractures of pelvis with stable disruption of pelvic ring, initial encounter for closed fracture (S32.810A) (Onset);
3) Nondisplaced fracture of left radial styloid process, initial for closed fracture (S52.515A) (Onset);
4) Other abnormalities of gait and mobility (R26.89) (Onset);
5) History of falling (Z91.81) (Onset);
6) Hypertension (I10) (Exacerbation); and
7) Muscle weakness (M62.81)

### III.     LIFE EXPECTANCY

Zeporah Moore is a 79-year-old female with 9.8 years of life expectancy pursuant to the Actuarial Period Life Table, 2018. Zeporah Moore should be compensated for past pain and suffering from the date of the accident, July 31, 2018, to August 31, 2018, at $50.00 per day (60 days x $50.00) = $3,000.00. Further, from August 31, 2018, until the last day of her treatment, September 7, 2018, at the rate of $25.00 per day (7 days x $25.00) = $175.00. Ms. Moore should also be compensated for future pain and suffering and the loss of enjoyment of life at the rate of $5 per day x 365 x 9.8 years - $17,885.00.

Based on the aforementioned details, Zeporah Moore's damages come to a total in the amount of **$21,060.00**, not including the medical bills referenced above.

### IV.     SPECIAL DAMAGES.

Under O.C.G.A. § 51-12-2, special damages flow from the tortious conduct and include past and future medical expenses, lost wages, future earnings, and lost profits.

Our client seeks the following medical expenses:

| Medical Provider | Dates of Service | Amount of Final Bill |
|---|---|---|
| Grady Memorial Hospital | 7/31/2018-8/7/2018 | $34,153.05 |
| Emory Medical Care Foundation | 7/31/2018-8/21/2018 | $1,160.00 |
| Apria Healthcare (Walker & Commode) | 8/7/2018 | $98.19 |
| Visiting Nurse Health Systems | 8/13/2018-9/7/2018 | $2,835.00 |
| **TOTAL MEDICALS** | | $38,246.24 |

| Walgreens (Prescriptions) | 8/8/2018-8/13/2018 | $35.23 |
| --- | --- | --- |
| **TOTAL SPECIALS** | | **$35.23** |

| **TOTAL MEDICALS & SPECIALS** | $38,281.47 |
| --- | --- |

## V. GENERAL DAMAGES.

Under O.C.G.A. § 51-12-2, general damages are those which the law presumes to flow from the alleged tortious conduct, even those damages that are requested without a specific proof of amount. General damages include damages for physical and mental pain and suffering, both past and future. Humiliation, shock, and fright, as well as diminished capacity to work, labor and earn money are encompassed in the definition of pain and suffering. Our client is also entitled to compensation for her pain and suffering, as general damages awarded to a plaintiff to compensate for all non-pecuniary loss, inconvenience, hardship, pain, discomfort and anxiety, mental, physical or both, experienced as a consequence of a personal injury. *Roberts v. Chapman*, 492 S.E.2d 144 (1997) Such damages include compensation for:

> interference with normal living; interference with enjoyment of life; loss of capacity to labor and earn money; impairment of bodily health and vigor; fear of extent of injury; shock of impact; actual pain and suffering, past and future; mental anguish, past and future; and the extent to which the plaintiff must limit activities.

Georgia Suggested Pattern Jury Instructions - Civil 66.501. See *Marts v. Cauley*, 163 S.E.2d 751, 751 (1968) (damages for pain and suffering include "past and future pain and suffering, physical and mental pain and suffering, and pain and suffering caused by plaintiff's diminished capacity to work and labor); *Cent. of Georgia R. Co. v. Cole*, 381 S.E.2d 60, 64 (1989) (damages for pain and suffering should include compensation for interference with enjoyment of life, impairment of health and vigor, and limitation of activities). Georgia law presumes that pain and suffering accompany a physical injury. *Cochran v. Lynch*, 126 Ga. App. 866 (1972); *Dodson v. Cobb*, 89 S.E.2d 552, 553 (1955) ("The law infers bodily pain and suffering from personal injury"); *Clark v. Wright*, 224 S.E.2d 825, 826 (1976) (same).

In addition to physical pain and suffering, our client is entitled to damages for mental pain and suffering. *Williams v. Vinson*, 123 S.E.2d 286-87 (1961). Damages for mental pain and suffering include compensation for the fright, shock, anxiety and worry caused by the plaintiff's injuries. *City of Warner Robins v. Holt*, 470 S.E.2d 242 (1996) ("Anxiety, shock and worry are examples of what might be included under mental pain and suffering."); *Monk v. Dial*, 441 S.E.2d 859 (1994) (approving damages award for "fright, shock, and mental suffering experienced by an individual due to wrongful acts of negligence").

Ms. Guzman
April 18, 2019
Page 8

## VI.  ATTORNEY'S FEES.

O.C.G.A. § 13-6-11 states as follows:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefore and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

Your insured acted in bad faith by its misconduct, which damaged my client. Any attempt of refusal to pay this claim by you and your insured is stubbornly litigious conduct as there is no bona-fide dispute as to this liability to my client, causing her unnecessary trouble and expense. See *Brown v. Baker*, 398 S.E.2d 797 (1990) (recovery of attorney fees authorized under O.C.G.A. § 13-6-11 for causing plaintiff unnecessary trouble and expense where a defendant, adopted a "so sue me" attitude and insisted on going to trial who had no valid reason for refusing to pay a claim); *Southern R. Co. v. Crowe*, 366 S.E.2d 846 (1988) (accord); *U-Haul Co. v. Ford*, 320 S.E.2d 868 (1984) (accord). Therefore, our demand also accounts for our attorney's fees and costs from our considerable time spent on this matter.

## VII.  DAMAGES DEMAND

With liability resting upon your insured, the relevant question becomes the amount of damages my client is entitled to recover. When evaluating this claim, you must consider the negligent and reckless conduct of your insured, as well as my client's past, present and future medical expenses; her past, present and future pain; and suffering and loss of wages; loss of enjoyment of life; and loss of earning potential for the remainder of her life.

Under O.C.G.A. § 51-12-14, otherwise known as the "Georgia Unliquidated Damages Interest Act," we demand **Two Hundred Thousand and No/100 ($200,000.00)** Dollars to settle any and all claims belonging to my client against your insured as to this incident. If this demand is not paid within thirty (30) days from the receipt of the mailing of this notice, my client shall be entitled to receive interest at the legal rate on the claimed sum, if upon trial of the case in which this claim is made the judgment is for an amount not less than the sum claimed. The demand is open only for thirty (30) days from the receipt of the USPS green certified mail receipt of this notice, after which time it is expressly withdrawn and the interest begins to run.

Our Federal Tax ID Number is 26-1729656 – attached is a W-9 for your information and use. Should you fail to respond by **May 20, 2019**, or it appears that the case cannot be otherwise resolved, then we expect to proceed immediately with litigation. Please let us know if you have any questions or need further information. I look forward to hearing from you soon.

Sincerely,

Matthew C. Hines, Esq.

MCH/kc